# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **LORI ANN SEIBER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION** |
| **v.** | ) | |
| | ) | **No. 13-2162-JWL** |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

## MEMORANDUM AND ORDER

Plaintiff seeks review of a decision of the Commissioner of Social Security (hereinafter Commissioner) denying Social Security Disability (SSD) benefits under sections 216(i) and 223 of the Social Security Act. 42 U.S.C. §§ 416(i) and 423 (hereinafter the Act). Finding no error, the court ORDERS that judgment shall be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) AFFIRMING the decision.

## I.      Background

Plaintiff applied for SSD, alleging disability beginning November 1, 2008. (R. 19, 306). In due course, Plaintiff exhausted proceedings before the Commissioner, and now seeks judicial review of the final decision denying benefits. She alleges the Administrative Law Judge (ALJ) erred in evaluating the opinions of the medical care providers and experts and in determining that her condition is not equivalent to Listing

11.09 for Multiple Sclerosis, and she alleges his credibility determination is neither linked to, nor supported by, the record evidence.  Finally, she argues that the ALJ's residual functional capacity (RFC) assessment does not comport with Social Security Ruling (SSR) 96-8p, and is not supported by substantial record evidence.

The court's review is guided by the Act.  Wall v. Astrue, 561 F.3d 1048, 1052 (10th Cir. 2009).  Section 405(g) of the Act provides that in judicial review "[t]he findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  The court must determine whether the ALJ's factual findings are supported by substantial evidence in the record and whether he applied the correct legal standard.  Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007); accord, White v. Barnhart, 287 F.3d 903, 905 (10th Cir. 2001).  Substantial evidence is more than a scintilla, but it is less than a preponderance; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971); see also, Wall, 561 F.3d at 1052; Gossett v. Bowen, 862 F.2d 802, 804 (10th Cir. 1988).

The court may "neither reweigh the evidence nor substitute [its] judgment for that of the agency."  Bowman v. Astrue, 511 F.3d 1270, 1272 (10th Cir. 2008) (quoting Casias v. Sec'y of Health & Human Servs., 933 F.2d 799, 800 (10th Cir. 1991)); accord, Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005).  Nonetheless, the determination whether substantial evidence supports the Commissioner's decision is not simply a quantitative exercise, for evidence is not substantial if it is overwhelmed by

other evidence or if it constitutes mere conclusion.  Gossett, 862 F.2d at 804-05; Ray v. Bowen, 865 F.2d 222, 224 (10th Cir. 1989).

The Commissioner uses the familiar five-step sequential process to evaluate a claim for disability.  20 C.F.R. §§ 404.1520, 416.920; Wilson v. Astrue, 602 F.3d 1136, 1139 (10th Cir. 2010) (citing Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988)).  "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary."  Wilson, 602 F.3d at 1139 (quoting Lax, 489 F.3d at 1084).  In the first three steps, the Commissioner determines whether claimant has engaged in substantial gainful activity since the alleged onset, whether she has a severe impairment(s), and whether the severity of her impairment(s) meets or equals the severity of any impairment in the Listing of Impairments (20 C.F.R., Pt. 404, Subpt. P, App. 1).  Williams, 844 F.2d at 750-51.  After evaluating step three, the Commissioner assesses claimant's RFC.  20 C.F.R. § 404.1520(e).  This assessment is used at both step four and step five of the sequential evaluation process.  Id.

The Commissioner next evaluates steps four and five of the sequential process-- determining at step four whether, in light of the RFC assessed, claimant can perform her past relevant work; and at step five whether, when also considering the vocational factors of age, education, and work experience, claimant is able to perform other work in the economy.  Wilson, 602 F.3d at 1139 (quoting Lax, 489 F.3d at 1084).  In steps one through four the burden is on Plaintiff to prove a disability that prevents performance of past relevant work.  Blea v. Barnhart, 466 F.3d 903, 907 (10th Cir. 2006); accord,

3

Dikeman v. Halter, 245 F.3d 1182, 1184 (10th Cir. 2001); Williams, 844 F.2d at 751 n.2. At step five, the burden shifts to the Commissioner to show jobs in the economy within the RFC assessed.  Id.; Haddock v. Apfel, 196 F.3d 1084, 1088 (10th Cir. 1999).

The court finds no error in the decision below.  Because the ALJ's credibility determination necessarily affects the evaluation of the medical opinions and the determination whether Plaintiff's condition is equivalent to Listing 11.09, the court begins with consideration of the ALJ's credibility determination.  It then considers the evaluation of the opinions of the record medical sources because that evaluation affects the next consideration--whether Plaintiff's condition is equivalent to Listing 11.09. Finally, the court will consider whether the ALJ's RFC assessment comports with SSR 96-8p and is supported by the record evidence.

## II.    The Credibility Determination

Plaintiff claims the ALJ failed to link his credibility determination with the record evidence, but made conclusions in the guise of findings, and thereby erred in failing to apply controlling law as expressed in Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995).[1]  She argues the record evidence does not support the credibility determination.

The Commissioner argues that the ALJ properly evaluated the credibility of Plaintiff's allegations of disabling symptoms.   Citing Hackett, 395 F.3d at 1173, the

---

[1]The court notes that counsel did not provide a complete citation to Kepler, and the partial citation provided ("68 F.3d at 691") is erroneous.  Nonetheless, the court was able to find the citation quoted.

Commissioner argues that the credibility determination should be affirmed because it is sufficiently detailed and supported by substantial evidence.

### A.   Standard for Evaluating Credibility

The court's review of an ALJ's credibility determinations is deferential.  They are generally treated as binding on review.  <u>Talley v. Sullivan</u>, 908 F.2d 585, 587 (10th Cir. 1990); <u>Broadbent v. Harris</u>, 698 F.2d 407, 413 (10th Cir. 1983).  "Credibility determinations are peculiarly the province of the finder of fact" and will not be overturned when supported by substantial evidence.  <u>Wilson</u>, 602 F.3d at 1144; <u>accord Hackett</u>, 395 F.3d at 1173.  Therefore, in reviewing the ALJ's credibility determinations, the court will usually defer to the ALJ on matters involving witness credibility.  <u>Glass v. Shalala</u>, 43 F.3d 1392, 1395 (10th Cir. 1994); <u>but see Thompson v. Sullivan</u>, 987 F.2d 1482, 1490 (10th Cir. 1993) ("deference is not an absolute rule").

Plaintiff bears the burden to show error in the ALJ's credibility finding; the mere fact that there is evidence which might support a contrary finding will not establish error in the ALJ's determination.  "The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence.  We may not displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo."  <u>Lax v. Astrue</u>, 489 F.3d 1080, 1084 (10th Cir. 2007) (citations, quotations, and bracket omitted); <u>see also, Consolo v. Fed. Maritime Comm'n</u>, 383 U.S. 607, 620 (1966) (same).  But, "[f]indings as to

5

credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings."  Huston v. Bowen, 838 F.2d 1125, 1133 (10th Cir. 1988).  Therefore, where the ALJ has reached a reasonable conclusion that is supported by substantial evidence in the record, the court will not reweigh the evidence and reject that conclusion even if it might have reached a contrary conclusion in the first instance.

**B.**     **The ALJ's Findings**

The ALJ's credibility analysis occupied pages 5 through 7 of the decision.  (R. 23-25).  He concluded that Plaintiff is lacking in credibility, and gave nine reasons for that conclusion.  (R. 25).  (1) She "highly exaggerated her symptoms at the hearing," testifying that she cannot stand more than two minutes.  Her limitations are not supported by (2) treatment notes or by (3) examining or reviewing physicians.  (4) She sought sporadic treatment in 2009 and 2010 and minimal treatment in 2011.  (5) Her daily activities are quite good.  (6) Plaintiff occasionally refuses to take medications which have been effective in controlling both her symptoms and the progression of her disease.  (7) Although Plaintiff's medications cause side effects, the treatment notes do not reflect limitations from the medications which are greater than the RFC assessed.  (8) The medical record contains several instances where Plaintiff's memory, speech, attention, and concentration are intact.  (9) There is minimal objective diagnostic or clinical evidence to support Plaintiff's allegations of a great deal of fatigue.  (R. 25).

**C.**     **Analysis**

Giving the ALJ's credibility determination the deference it is due, it is sufficiently detailed and is supported by substantial evidence.  Plaintiff merely takes a strained view of the record and of her testimony and attempts to show that the ALJ's reasons are not supported by the record evidence.  In her very first argument, she asserts that, contrary to the ALJ's example of exaggeration, she "did not testify that she cannot not [sic] stand for more than 'two minutes.'" (Pl. Br. 45).  The record which is at the heart of this controversy is Plaintiff's hearing testimony in response to her attorney's questions concerning Dr. Fortune's report regarding her abilities to walk, stand, and sit.  (R. 96-97).

Q.    Okay. You were also seen by a Dr. Fortune at Exhibit 12F.  He said, and I can't tell if he's saying this or he's saying that you did.  He said she can walk one mile slowly.  Would you have told him that?

A.    I doubt it.  I don't even really remember that visit, but I don't think so.

Q.    Can you walk a mile?

A.    If I was forced to, maybe.

Q.    Do you walk?

A.    I haven't done it in a long time?

Q.    Do you walk very much?

A.    No.  You mean like outside?  No.

Q.    So you limit your walking.

A.    Yes.

Q.    Because?

A.    Because it's going to hurt if I do it.

Q.    Okay.  And he said you have no trouble sitting.  Would you have told one doctor that you did and the other doctor that you didn't.

A.    I don't think so.

Q.    Do you have trouble sitting?

A.    Yes.

Q.    He said that you can stand for 15 minutes.

A.    Huh-uh.

Q.    Do you stand?  Can you Stand?

A.    No.  It's hard for me to take a three minute shower.

Q.    Do you have any difficulty reading?

7

> A.     At night sometimes the words get blurry.  And sometimes when I
> was working on my computer, the same thing would happen.

(R. 96-97).

To be sure, Plaintiff did not testify that she "cannot stand more than two minutes." However, the only understanding from her testimony is that it's hard for her to stand long enough to take a three minute shower.  Plaintiff testified that she does not, and cannot, stand--that it's hard "to take a three minute shower."  The ALJ's finding that Plaintiff exaggerated her symptoms at the hearing is supported by the record evidence to which he refers.  In her brief, Plaintiff attempts to justify the testimony as though it's in response to earlier and later questions regarding her difficulty showering in which she stated that "showering is very difficult"(R. 94), and "it's difficult to take a shower."  (R. 97).  The court above quoted the entire exchange regarding Dr. Fortune's report, and that exchange makes clear that the testimony the ALJ referred to wasn't about difficulty showering, but rather, Plaintiff referred to her difficulty showering for three minutes to emphasize that she can't stand for more than a very short time.

Plaintiff next argues that the record does not "support the ALJ's finding that Plaintiff sought minimal treatment in 2011 and sporadic treatment in 2009 and 2010.  As set forth in the Statement of Facts, supra, plaintiff sought and received consistent treatment from numerous providers throughout the period at issue."  Plaintiff's reference to her "Statement of Facts" refers to a twenty five page Statement of Facts appearing earlier in her brief.  (Pl. Br. 2-26).  That citation is no more helpful than a citation to the

8

"record as a whole." The court notes that throughout her brief, Plaintiff cites to the statement of facts or to multiple page portions of that statement of facts to support many of her arguments. That is not helpful. It is Plaintiff's burden to show error in the ALJ's decision, and that means making a pinpoint citation to the specific portion or portions of the record which demonstrate error in the ALJ's decision. Even a pinpoint citation to Plaintiff's statement of the facts is not helpful because the court's review is based upon the record, not what counsel says the record says. Nevertheless, as is its duty, the court has reviewed the record and has found that at least as to treatment for Multiple Sclerosis, the impairment for which Plaintiff contends she equals the Listing, the record can fairly be characterized as showing that Plaintiff sought sporadic treatment in 2009 and 2010, and minimal treatment in 2011. The mere fact that Plaintiff cites diagnoses of impairments and certain reports of symptoms says nothing about the severity of the limitations imposed by those impairments or symptoms. The ALJ's focus, and consequently the court's focus is on such limitations and restrictions as are demonstrated by the evidence. Plaintiff has shown no error in the ALJ's credibility determination.

Plaintiff argues that the ALJ has not affirmatively linked his credibility findings to the record evidence. The court finds no error in this regard. In just the discussions above, it becomes evident that the ALJ's findings are linked to the record evidence. Plaintiff's remaining arguments of error in the credibility determination are to a similar effect, and essentially ask the court to reweigh the evidence, determine that the evidence relied upon

by Plaintiff is of greater weight than that relied upon by the ALJ, and substitute its judgment for that of the ALJ.  That it is forbidden to do.

### III.   Evaluation of the Opinion Evidence

Plaintiff claims the ALJ erroneously accorded greater weight to the nontreating and nonexamining source opinions of the state agency and consultative physicians than to the opinions of her treating and examining physicians and her treating nurse-practitioner, and that he erroneously accorded greater weight to the opinion of the medical expert procured by the Social Security Administration (SSA) than to the opinion of the medical expert procured by Plaintiff.  Specifically, Plaintiff complains that there is no mention of the medical opinion of Dr. Rowe, her treating neurologist, allegedly contained in a February 28, 2011 progress note.  She argues that the ALJ erroneously rejected the opinion of her treating nurse-practitioner, Mr. Schell, provided in a letter to which the February 28, 2011 progress note of Dr. Rowe was attached.  She argues that the ALJ also failed to address the "findings and opinions" of Dr. Sullivan, her primary care physician, and of the University of Kansas Hospital (KU) providers who treated her for Trigeminal Neuralgia from 2010 through 2011.  Plaintiff claims that the ALJ accorded excessive weight to the opinions of the nontreating and nonexamining source opinions of the state agency and consultative physicians because they did not consider the evidence produced after December 2009, and because there is no evidence that the nontreating consultative physicians, Dr. Miles and Dr. Fortune, even reviewed the other evidence available when they performed their examinations.  Finally, Plaintiff claims that the medical opinion of

the expert she obtained, Dr. Kaplan, should have been given greater weight than the medical opinion of the SSA expert, Dr. Goren., because Dr. Goren was not aware that the time period at issue was after November 2008, because he did not consider the evidence thereafter, and he improperly relied upon Dr. Fortune's report.  She argues that, on the other hand Dr. Kaplan relied upon Dr. Rowe's November 2008 physical examination.

The Commissioner argues that the ALJ properly considered the opinion evidence. She argues that the ALJ properly evaluated and discounted Mr. Schell's letter, and that Plaintiff does not point to an opinion by Dr. Rowe which was not considered by the ALJ. She argues that although the state agency and consultative doctors did not review all of the record evidence, they need not have done so because the ALJ is the one who resolves the conflicts in the record.  Finally, she argues that the record evidence supports the ALJ's evaluation of Dr. Goren's and Dr. Kaplan's medical opinions.

### A.      Standard for Evaluating Opinion Evidence

"Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s) including [claimant's] symptoms, diagnosis and prognosis." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2).  Such opinions may not be ignored and, unless a treating source opinion is given controlling weight, all medical opinions will be evaluated by the Commissioner in accordance with factors contained in the regulations. Id. §§ 404.1527(c), 416.927(c) (effective February 23, 2012); SSR 96-5p, West's Soc. Sec. Reporting Serv., Rulings 123-24 (Supp. 2014).  A physician or psychologist who has

treated a patient frequently over an extended period of time (a treating source)[2] is

expected to have greater insight into the patient's medical condition, and his opinion is

generally entitled to "particular weight." Doyal v. Barnhart, 331 F.3d 758, 762 (10th Cir.

2003).  But, "the opinion of an examining physician [(a nontreating source)] who only

saw the claimant once is not entitled to the sort of deferential treatment accorded to a

treating physician's opinion." Id. at 763 (citing Reid v. Chater, 71 F.3d 372, 374 (10th

Cir. 1995)).  However, opinions of nontreating sources are generally given more weight

than the opinions of nonexamining sources who have merely reviewed the medical

record.  Robinson v. Barnhart, 366 F.3d 1078, 1084 (10th Cir. 2004); Talbot v. Heckler,

814 F.2d 1456, 1463 (10th Cir. 1987) (citing Broadbent v. Harris, 698 F.2d 407, 412

(10th Cir. 1983), Whitney v. Schweiker, 695 F.2d 784, 789 (7th Cir. 1982), and Wier ex

rel. Wier v. Heckler, 734 F.2d 955, 963 (3d Cir. 1984)).

"If [the Commissioner] find[s] that a treating source's opinion on the issue(s) of

the nature and severity of [the claimant's] impairment(s) [(1)] is well-supported by

medically acceptable clinical and laboratory diagnostic techniques and [(2)] is not

---

[2]The regulations define three types of "acceptable medical sources:"

"Treating source:" an "acceptable medical source" who has provided the claimant with medical treatment or evaluation in an ongoing treatment relationship.  20 C.F.R. §§ 404.1502, 416.902.

"Nontreating source:" an "acceptable medical source" who has examined the claimant, but never had a treatment relationship.  Id.

"Nonexamining source:" an "acceptable medical source" who has not examined the claimant, but provides a medical opinion.  Id.

inconsistent with the other substantial evidence in [claimant's] case record, [the Commissioner] will give it controlling weight."  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); see also, SSR 96-2p, West's Soc. Sec. Reporting Serv., Rulings 111-15 (Supp. 2010) ("Giving Controlling Weight to Treating Source Medical Opinions").

The Tenth Circuit has explained the nature of the inquiry regarding a treating source's medical opinion.  Watkins v. Barnhart, 350 F.3d 1297, 1300-01 (10th Cir. 2003) (citing SSR 96-2p).  The ALJ first determines "whether the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques.'"  Id. at 1300 (quoting SSR 96-2p).  If the opinion is well-supported, the ALJ must confirm that the opinion is also consistent with other substantial evidence in the record.  Id.  "[I]f the opinion is deficient in either of these respects, then it is not entitled to controlling weight."  Id.

If the treating source opinion is not given controlling weight, the inquiry does not end.  Id.  A treating source opinion is "still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927."  Id.  Those factors are:  (1) length of treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.  Id. at 1301; 20 C.F.R. §§ 404.1527(d)(2-6), 416.927(d)(2-6); see

also Drapeau v. Massanari, 255 F.3d 1211, 1213 (10th Cir. 2001) (citing Goatcher v. Dep't of Health & Human Servs., 52 F.3d 288, 290 (10th Cir. 1995)).

After considering the factors, the ALJ must give reasons in the decision for the weight he gives the opinion.  Id. 350 F.3d at 1301.  "Finally, if the ALJ rejects the opinion completely, he must then give 'specific, legitimate reasons' for doing so."  Id. (citing Miller v. Chater, 99 F.3d 972, 976 (10th Cir. 1996) (quoting Frey v. Bowen, 816 F.2d 508, 513 (10th Cir. 1987)).

Recognizing the reality that an increasing number of claimants have their medical care provided by health care providers who are not "acceptable medical sources"--nurse practitioners, physician's assistants, social workers, and therapists, the Commissioner promulgated SSR 06-3p.  West's Soc. Sec. Reporting Serv., Rulings 327-34 (Supp. 2014).  In that ruling, the Commissioner noted:

> With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists.  Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.

Id. Rulings, 330-31.

SSR 06-3p explains that such opinions will be evaluated using the regulatory factors for evaluating medical opinions; id. at 331-32(citing 20 C.F.R. §§ 404.1527,

416.927); and explains that the ALJ "generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the . . . decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." Id. at 333.

### B.    The ALJ's Findings

The ALJ accorded "greatest weight" to the medical opinion of Dr. Goren, the medical expert procured by the SSA.  He found that Dr. Goren's "opinion is well-supported and most consistent with the medical record, including the opinions of Drs. Vopat and Fortune."  (R. 25).  On the other hand, he accorded "minimal weight" to Dr. Kaplan's opinion."

The ALJ also gave "minimal weight to the letter written by" Plaintiff's nurse-practitioner, Mr. Schell, and "significant weight" to the opinions of Dr. Fortune and Dr. Miles, a consultative, nontreating physician and psychologist, respectively who provided reports of examinations of the Plaintiff; and Dr. Vopat and Dr. Blum a nonexamining physician and psychologist, respectively, who reviewed the record for the state agency.

### C.    Analysis

The court begins with Plaintiff's allegations regarding the ALJ's evaluation of the "opinions" of Mr. Schell and of Dr. Rowe.  Plaintiff's arguments in regard to both opinions relate to a letter sent to Plaintiff's attorney on April 13, 2011on the letterhead of the MidAmerica Neuroscience Institute and signed by Doug A Schell, her nurse-

15

practitioner.  (R. 650).  In that letter, Mr. Schell explained that although Plaintiff asked the institute to complete a "Medical Source Statement," "We never complete those types of forms."  Id.  Mr. Schell noted that he sent a copy of Plaintiff's progress note completed on February 28, 2008 which "details the symptoms that her Multiple Sclerosis causes and how those symptoms have prevented her from working full-time for some time now."  Id. He then explained that "We" support Plaintiff's application for disability, that Plaintiff believes she can work part time, and that if she is unable to do so "we would support full and complete disability."  Id.

The ALJ gave "minimal weight to this letter because Mr. Schell is not an acceptable medical source" and because the "letter does not contain the information needed to be considered a medical opinion."  (R. 27) (citing 20 C.F.R. 404.1527(a)(2)) (defining medical opinions).  He noted that Mr. Schell's opinion regarding the ultimate issue of disability was given no weight because such an opinion is reserved to the Commissioner.   Each reason given by the ALJ to discount Mr. Schell's opinion is correct and is supported by the record evidence.  Plaintiff's argument that the ALJ did not properly apply the factors from SSR 06-3p is without merit.  As Plaintiff's quotation from SSR 06-3p acknowledges, nurse-practitioners such as Mr. Schell are "not technically deemed 'acceptable medical sources.' " (Pl. Br. 28-29, n.1) (quoting SSR 06-3p).  That is specifically the finding of the ALJ.  Moreover, although SSR 06-3p requires that such opinions "are important and should be evaluated on key issues such as impairment severity and functional effects," SSR 06-3p, West's Soc. Sec. Reporting Serv., Rulings

16

330-31 (Supp. 2014), Mr. Schell's "letter does not contain the information needed to be considered a medical opinion," as the ALJ found.  (R. 27).  The information needed to make the letter a medical opinion is precisely that information to which Plaintiff appeals-- impairment severity, and functional effects.  Beyond an appeal to Dr. Rowe's progress note dated February 28, 2011, and a statement that "we would support full and complete disability" (R. 650), Mr. Schell's letter does not provide any opinion regarding impairment severity or any opinion regarding specific functional limitations resulting from Plaintiff's MS.  And, although an opinion regarding the ultimate issue of disability must not be completely disregarded, as the ALJ noted such an opinion is reserved to the Commissioner.  Plaintiff's appeal to the opinion regarding disability is not supported by citation to functional limitations or restrictions requiring a finding of disability.  She has shown no error in evaluating Mr. Schell's opinion.

Plaintiff also appears to view Mr. Schell's letter and Dr. Rowe's progress note dated February 28, 2011 to be an opinion from Dr. Rowe which should have been evaluated as a treating source opinion.  As to the letter, even though Mr. Schell uses the term "we" throughout, he does not identify to whom, beyond himself, the "we" applies. The most that can be said of the "we" is that Mr. Schell appears to be presenting the "corporate" opinion of the MidAmerica Neuroscience Institute.  The record contains no indication whatsoever that Mr. Schell has authority, apparent or otherwise, to speak for the Institute or any individual professional therein.  A "medical opinion" must be provided by an "acceptable medical source," and the regulations do not include anything

17

beyond individual, licensed, professionals within the definition of an "acceptable medical source."  20 C.F.R. §§ 404.1513(a), 416.913(a).  That the letter might be Dr. Rowe's medical opinion is refuted by the fact that there is no indication in the record that Dr. Rowe ever signed, or adopted the letter as his own opinion.  The remaining question is whether Dr. Rowe's February 28, 2011 progress note constitutes a medical opinion which the ALJ erroneously ignored.  Plaintiff asserts it is.

A "medical opinion" is a statement from an acceptable medical source that reflects the physician's judgments about a claimant's symptoms, diagnosis and prognosis.  The court notes that the progress note to which Plaintiff refers has some of the content of that note cut off at the right margin, making it difficult at times to follow the complete narrative of the note.  (R. 651-54).  The note at issue contains a section titled "HPI," History of the Present Illness.  This section records a history consisting primarily of reports of Plaintiff's symptoms over time.  In that section, the only discernible statement tending with particularity to reflect <u>Dr. Rowe's judgment</u> is, "she continues to experience numerous symptoms, which make it difficult to work full time."  (R. 651).  This statement does not identify the specific symptoms referred to, and to attempt to identify particular symptoms which are included in the section and make it difficult to work full time, would merely be speculation regarding Dr. Rowe's opinion.  Neither the ALJ nor the court might speculate with regard to Dr. Rowe's opinion.  Moreover, the statement does not explain the specific difficulty Plaintiff has working full-time and does not explain whether it is difficult or impossible for her to work full-time, or why that is so.

18

The section of the treatment note titled "Assessment/Plan" does contain Dr. Rowe's judgment regarding diagnoses of relapsing-remitting multiple sclerosis (RRMS), and leftsided orofacial pain and paresthesias due to lingual nerve damage.  (R. 653). Even though it would be prohibitively time consuming and cumbersome for an ALJ to specifically discuss every progress note and the diagnoses and symptoms contained therein, the ALJ clearly accepted these diagnoses since he found Plaintiff has multiple sclerosis and neuritis (R. 21), he specifically considered Plaintiff's "tongue numbness," and he found that it did not produce greater functional limitations than assessed in his RFC assessment.  (R. 22).  Plaintiff points to no medical opinion of Dr. Rowe which in the context of this case should have been, but was not, discussed by the ALJ.

Plaintiff argues that the ALJ failed to address the findings and opinions of Dr. Sullivan and the KU providers.  (Pl. Br. 29-30).  However, Plaintiff points to no restriction or limitation about which these providers opined, and which should have been addressed by the ALJ.  Later in her brief, Plaintiff argues that she "saw Dr. Sullivan on May 5, 2010, after an April 28, 2010 ER visit for lightheadedness.  (Tr. 625).  Dr. Sullivan reported that plaintiff's lightheadedness "**had not resolved**," which is contrary to the ALJ's statement that:  "she was treated and discharged in stable condition with **no evidence of recurrence**."  (Pl. Br. 34) (quoting R. 625, 24).  This argument is also without merit.  In the treatment note to which Plaintiff cites, Dr. Sullivan stated, "Pt is here for ER followup.  She was seen for lightheadedness and it ha**s now** resolved."  (R.

625) (emphasis added).  Plaintiff has simply misquoted the treatment note.  The ALJ's finding is confirmed by the evidence Plaintiff seeks to rely upon.

Throughout her brief, Plaintiff cites to evidence from her treating sources that she had been treated for Trigeminal Neuralgia and related pain (Pl. Br. 34, 35, 36), that she had symptoms such as lightheadedness (Pl. Br. 34), severe anxiety, id., and malaise/fatigue.  Id., at 36.  But, notably lacking from each citation by Plaintiff is a medical opinion regarding a quantified restriction or limitation in Plaintiff's functioning which is greater than that assessed by the ALJ.  Plaintiff argues that the ALJ's determination was wrong, but she does not cite to any evidence requiring, or demonstrating that the ALJ's determination is wrong.  In effect, Plaintiff asks the court to review the evidence to which she cites, to agree with her evaluation of that evidence, and to substitute its judgment for that of the ALJ.  It may not do so.  Bowman, 511 F.3d at 1272; accord, Hackett, 395 F.3d at 1172.  Plaintiff has shown no error in the ALJ's evaluation of her treating source opinions.  In fact, she has not shown that most of them actually had an opinion which might have been evaluated.

With regard to the opinions of Drs. Blum, Vopat, Miles, and Fortune, Plaintiff argues that the ALJ erred in affording excessive weight to their opinions because they did not review the record evidence after December 2009, and because Drs. Blum and Vopat did not examine the plaintiff.  This argument is without merit.  There is simply no authority requiring that a medical opinion can only be relied upon if that doctor reviewed all of the medical evidence eventually admitted into the record.  Plaintiff quotes a Sixth

Circuit case for the proposition that a state agency physician's opinion can outweigh a treating source opinion only if the state agency physician has reviewed the complete case record.  (Pl. Br. 30) (quoting Blakely v. Comm'r of Soc. Sec., 581 F.3d 399, 409 (6th Cir. 2009).  That argument fails for two reasons.  First, a Sixth Circuit case is not controlling in this circuit.  Second, and perhaps more importantly, Plaintiff has not shown a treating source opinion which is contrary to any of these doctors' opinions.

Finally, the court considers the ALJ's evaluation of the medical experts' opinions. Plaintiff argues, once again, that Dr. Goren did not address any record evidence dated after December 2009, that Dr. Goren was not aware that the period at issue in this case was after November, 2008, and that Dr. Goren improperly relied upon an opinion produced in August 2005.  Contrary to Plaintiff's argument, there is no record evidence that Dr. Goren was unaware that the period at issue here began in November 2008.  Dr. Goren specifically testified that he had received and had reviewed all of the medical records, Exhibits 1-29F.  (R. 40-41).  Those records cover the period from August 23, 2005 (R. 716-17) through November 28, 2011.  (R. 711-14); see also (R. 485-718) (Exhibits 1F-29F).  There is simply no evidence to the contrary.  Despite Plaintiff's assertion that "it is clear Dr. Goren was not aware of the period at issue," the record specifically reveals he was aware, at least generally, of the period at issue, and had unquestionably reviewed all of the medical evidence in that regard.

Moreover, Dr. Goren specifically cited a "minimally abnormal examination on November 21, 2008."  (R. 41) (citing Ex. 4F, 14-16 (R. 543-45)).  The record to which

21

Dr. Goren cited is Dr. Rowe's November, 2008 treatment note in which Dr. Rowe noted that Plaintiff had relapsing-remitting multiple sclerosis for 15 years and she was <u>currently in relapse</u>, which he would treat with oral prednisone and "gabapentin to hopefully control painful paresthesias." (R. 544). Dr. Goren also cited "a normal examination on March 17, 2009." (R. 41) (citing Ex. 7F, 4-5 (R. 563, 564)). Exhibit 7F is a report of a visit by Plaintiff to Dr. Lynch, a neurologist and professor at the University of Kansas Hospital who had last treated Plaintiff four years earlier. (R. 563). Plaintiff was seeking a second opinion regarding whether she should start taking Copaxone as recommended by Dr. Rowe. <u>Id.</u> Dr. Lynch summarized the history of the present illness, and noted that:

> In November of this year, she had the onset of increased numbness in her feet and achiness in her calves with trouble walking. This was perhaps the worst attack she has had in a long time and she again got steroids for it. She did not want to use IV [intravenous] steroids because she had a history of making her feel very anxious and unable to sleep. The [oral] prednisone did not work as it has in the past and while <u>she has gotten better</u> if it is [sic] taken a lot longer and she does still have some numbness and tingling in her feet.

(R. 563). Dr. Lynch summarized her "Physical Exam:"[3]

> She is alert and oriented x3. Speech and language are intact. Attention span, concentration, and recent and remote memory are intact. Gait is normal. Motor strength is 5/5 throughout.

---

[3]Plaintiff asserts that the ALJ acknowledged at the hearing that this was not a physical exam, but a report of a visit (Pl. Br. 32), and the transcript of the hearing reveals that the ALJ stated, "I don't think it is a physical examination. It's a report of one visit." (R. 60). However, in the report, there is a section entitled "Physical Exam," Dr. Goren described it as a physical examination, and in the decision, the ALJ cites it as a physical examination. (R. 28) (citing Ex. 7F/4).

> Review of her MRI scan reveals moderate amount of white matter disease. There are films from the past six years beginning in 2003. The brain MRI shows no change from 2003 to the present. She also had C-Spine MRIs done that did show a lesion present, the lesion has also not changed in several years.

(R. 563). The fact that Dr. Goren specifically cited the reports of Dr. Rowe and Dr. Lynch, and that he stated that he had reviewed all of the medical evidence, strongly suggests that he was aware of the relapse in November 2008, and the progress of the disease thereafter.

Plaintiff's argument that Dr. Goren was unaware of the period at issue is mere speculation apparently premised upon the fact that Dr. Goren in his testimony did not cite any evidence dated after December 2009. Plaintiff cites no authority for such a requirement. Plaintiff's argument is merely another attempt to get the court to substitute a different judgment for that of the ALJ. Plaintiff's further argument that it was error for Dr. Goren to use Dr. Weinstein's August 2005 report is without merit. To be sure, Dr. Weinstein's report was from before the period of alleged disability. However, the court is aware of no restriction upon medical evidence which may be relied upon by a medical expert, and Plaintiff points to none. Moreover, if it was error for the expert to rely upon that report, the error, if not invited by Plaintiff was at least introduced by Plaintiff. The evidence indicates that Dr. Weinstein's reports were faxed into the record by Plaintiff on January 17, 2012 (R. 715-17) (Exhibit 29F), were received and reviewed by Dr. Goren (R. 40-41), and were relied upon by Dr. Goren at the hearing two days later on January 19, 2012. (R. 37-42).

The ALJ accorded "greatest weight" to Dr. Goren's opinion because it was well-supported, and was most consistent with the medical record, including the opinions of Dr. Vopat and Dr. Fortune.  The court's review supports the ALJ's findings.  Dr. Goren opined that Plaintiff's MS was "mild throughout the record" (R. 41), but Plaintiff asserts that the only statements in the record regarding "mild" MS were made by Dr. Rowe before November 2008.  Plaintiff is correct that no one but Dr. Goren used that term to describe Plaintiff's MS after November 2008, but that fact does not mean that the record after November 2008 reflects that Plaintiff's MS is not mild.  The truth regarding the treatment records after November 2008 is that most of them deal primarily with issues other than multiple sclerosis.  (R. 620-26, 627-28, 629-31, 654-56, 663-97, 699-700, 705-06, 709, 711).  Although MS is frequently mentioned as one of Plaintiff's conditions, the treatment at those visits is primarily related to other conditions.  Plaintiff had only 5 visits after November 2008 which can fairly be said to concern multiple sclerosis primarily.  Although a treatment note is not in the record, the record reveals that on January 15, 2009 Plaintiff had a visit with the MidAmerica Neuroscience Institute in which she was prescribed a course of prednisone to treat her MS relapse.  (R. 660).  On February 2, 2009, Plaintiff returned for a followup and reported that she had improved although she was worried that she still had discomfort in her legs.  Id.  Plaintiff visited Dr. Lynch on March 19, 2009 as discussed above and was started on Copaxone treatment.  It was more than a year later on May 7, 2010 that Plaintiff made the next office visit related to her MS.  (R. 656-60).  The record reveals that although Plaintiff reported feeling unwell for

24

the last two weeks, Mr. Schell reported that "neurologic examination today does not appear any worse tha[n] November 2008, and actually appears improved in a few respects."  (R. 659).  Two days earlier, on May 5, 2010, Plaintiff had visited Dr. Sullivan, her primary care physician, because of "complicated anxiety," and Dr. Sullivan had stated, "Her MS is stable."  (R. 623). Nine months later, on February 28, 2011, Plaintiff visited Dr. Rowe once again, and the treatment note is as discussed above when the court considered the ALJ's evaluation of Mr. Schell's opinion and Dr. Rowe's opinion.  There is simply no indication in the record that the course of Plaintiff's MS was significantly worse after November 2008 than it was before then.  Plaintiff cannot show that Dr. Goren's characterization of her MS as "mild throughout the record" is erroneous, or that his opinion was based solely on evidence before December 2009.

Plaintiff next argues that it was error for Dr. Goren to rely upon Dr. Fortune's statement that Plaintiff said she can walk one mile.  The court does not agree.  The purpose of consultative examinations such as Dr. Fortune's examination is to determine the physical abilities of claimants such as Plaintiff.  One way to make those determinations is to record the claimants' reports.  Despite Plaintiff's assertion that the basis for Dr. Fortune's statement is unclear (Pl. Br. 32), in the context of Dr. Fortune's report, there can be no doubt that the statement that Plaintiff can "walk one mile slowly" came from Plaintiff's report of her condition, because it appears at the beginning of Dr. Fortune's report in the same paragraph in which it is reported that "[s]he has had achiness and stiffness in her neck," that she worked for ten years as a transcriptionist, and that she

25

is able to drive a car.  (R. 588).  Clearly, all of this information was received in Dr. Fortune's initial interview with Plaintiff.  Plaintiff implies from her hearing testimony as quoted above at pp. 6-7 that she did not provide this information to Dr. Fortune. However, the ALJ found that Plaintiff's allegations of symptoms are not credible and the court found that determination was supported by substantial record evidence.  Moreover, Plaintiff did not testify that she did not tell Dr. Fortune she can walk a mile.  Rather she said, "I doubt it.  I don't even really remember that visit, but I don't think so."  (R. 96). When her attorney specifically asked her, "Can you walk a mile?" she responded, "If I was forced to, maybe."  Id.  Plaintiff's equivocation on this point and throughout her testimony regarding Dr. Fortune's examination does not provide a basis to find that Dr. Goren improperly relied upon Dr. Fortune's report.  The ALJ explained his bases for according the "greatest weight" to Dr. Goren's opinion, and "minimal weight" to Dr. Kaplan's opinion.  (R. 25-27).  The record supports those determinations, and Plaintiff's contrary argument does not require a different result.  The court finds no error in the ALJ's evaluation of the opinion evidence.

## IV.	Medical Equivalence to Listing 11.09

Plaintiff claims the ALJ erred in finding that her condition is not medically equivalent to Listing 11.09 for Multiple Sclerosis.

### A.	Standard for Evaluating Step Three

The Commissioner has provided a "Listing of Impairments" which describes certain impairments that she considers disabling.  20 C.F.R. §§ 404.1525(a), 416.925(a)

(2012); see also, Pt. 404, Subpt. P, App. 1 (Listing of Impairments).  If plaintiff's

condition meets or equals the severity of a listed impairment, that impairment is

conclusively presumed disabling.  Williams, 844 F.2d at 751; see Bowen v. Yuckert, 482

U.S. 137, 141 (1987) (if claimant's impairment "meets or equals one of the listed

impairments, the claimant is conclusively presumed to be disabled").  However, plaintiff

"has the burden at step three of demonstrating, through medical evidence, that his

impairments 'meet all of the specified medical criteria' contained in a particular listing."

Riddle v. Halter, No. 00-7043, 2001 WL 282344 at *1 (10th Cir. Mar. 22, 2001) (quoting

Sullivan v. Zebley, 493 U.S. 521, 530 (1990) (emphasis in Zebley)); see also, Thompson

v. Sullivan, 987 F.2d 1482, 1487 (10th Cir. 1993) (burden shifts to Commissioner only at

step five).  "An impairment that manifests only some of [the listing] criteria, no matter

how severely, does not qualify" to meet or equal the listing.  Zebley, 493 U.S. at 530.

"The [Commissioner] explicitly has set the medical criteria defining the listed

impairments at a higher level of severity than the statutory standard.  The listings define

impairments that would prevent an adult, regardless of his age, education, or work

experience, from performing any gainful activity, not just 'substantial gainful activity.'"

Zebley, 493 U.S. at 532-33 (emphasis in original) (citing 20 C.F.R. § 416.925(a) (1989)).

The listings "streamlin[e] the decision process by identifying those claimants whose

medical impairments are so severe that it is likely they would be found disabled

regardless of their vocational background."  Yuckert, 482 U.S. at 153.  "Because the

Listings, if met, operate to cut off further detailed inquiry, they should not be read expansively."  <u>Caviness v. Apfel</u>, 4 F. Supp. 2d 813, 818 (S.D. Ind. 1998).

### B. <u>Analysis</u>

Plaintiff agrees that her condition does not meet all of the criteria of Listing 11.09. However, she argues that, as Dr. Kaplan opined, her condition is equivalent in severity to the Listing.  <u>Medical equivalence</u> to a listing may be established by showing that the claimant's impairment(s) "is at least equal in severity and duration to the criteria of any listed impairment."  20 C.F.R. §§ 404.1526(a), 416.926(a).  The determination of medical equivalence is made without consideration of vocational factors of age, education, or work experience.  20 C.F.R. §§ 404.1526(c), 416.926(c).  As Plaintiff argues, medical equivalence may be shown in one of three ways, depending on whether the claimant has an impairment described in the Listing of Impairments, has an impairment that is not described in the Listing of Impairments, or has a combination of impairments, no one of which meets a Listing.  Here, Plaintiff has a combination of impairments, MS, asthma, and neuritis, no one of which meets a listing.  Therefore the third means of showing medical equivalence is at issue and the court must compare Plaintiff's "findings with those for closely analogous listed impairments."  20 C.F.R. §§ 404.1526(b)(3), 416.926(b)(3).  Plaintiff basis her argument upon Dr. Kaplan's testimony that her condition is equivalent in severity to Listing 11.09, so that is the only analogous listed impairment which must be considered.  Thus, Plaintiff's condition is medically equivalent

to Listing 11.09 if other findings related to that Listing are at least of equal medical significance to all of the required criteria of that Listing.

Listing 11.09 may be met in three ways, by showing disorganization of motor function, 11.09A; by showing "visual or mental impairment as described under the criteria in 2.02, 2.03, 2.04, or 12.02," 11.09B; or by showing "significant, reproducible fatigue of motor function with substantial muscle weakness on repetitive activity, demonstrated on physical examination, resulting from neurological dysfunction in areas of the central nervous system known to be pathologically involved by the multiple sclerosis process."  20 C.F.R., Pt. 404, Subpt. P, App. 1 § 11.09B & C.

Dr. Kaplan testified that Plaintiff has the visual or mental impairment of Listing 11.09B, and has significant, reproducible fatigue as in Listing 11.09C and that in combination with excessive daytime hypersomnolence, and numbness and pain in her legs, her condition would be equivalent in severity to "some of the things that are listed under 11.09."  (R. 65).  Plaintiff relies extensively on Dr. Kaplan's opinion, and argues vigorously that the ALJ misapprehended that opinion.

All of Dr. Kaplan's testimony and Plaintiff's argument misses the point that at the third step in the sequential evaluation process it is Plaintiff's burden to demonstrate that the findings with reference to Plaintiff's condition are "at least of equal medical significance to the required criteria."  20 C.F.R. §§ 404.1526(b)(1)(ii), 416.926(b)(1)(ii).  Nowhere does Plaintiff identify to which criteria of Listing 12.09B she argues her condition is of equal medical significance.  Nor with regard to either Listing 11.09B or

Listing 11.09C does she explain how her findings regarding MS, trigeminal neuralgia, fatigue, numbness or pain in her legs, or any other impairment are at least equal in medical significance to the criteria of the Listings which would preclude performing any gainful activity, as the Supreme Court noted in Zebley, 493 U.S. at 532-33.  See also, 20 C.F.R. §§ 404.1525(a), 416.925(a) (the listings describe impairments which prevent any individual from performing any gainful activity regardless of age, education, or work experience).  Aside from the fact that the ALJ properly accorded minimal weight to the opinion of Dr. Kaplan, Plaintiff has simply failed in her burden at step three.

## V.     Plaintiff's RFC Argument

Because Plaintiff's RFC argument rests upon the other errors alleged in her Brief, and the court has found no error, this argument must, likewise, fail.

**IT IS THEREFORE ORDERED** that  judgment shall be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) AFFIRMING the Commissioner's decision.

Dated this 30th day of September 2014, at Kansas City, Kansas.


s:/ John W. Lungstrum
**John W. Lungstrum**
**United States District Judge**